**Opinion issued November 24, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00119-CV

————————————

**CHARLES MANDEVILLE, Appellant**

**V.**

**DEBORAH MANDEVILLE, Appellee**

---

**On Appeal from the 387th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 14-DCV-211809**

---

## MEMORANDUM OPINION

Charles Mandeville appeals a final decree of divorce on the grounds that the trial court erred by (1) excluding a marital property agreement from evidence presented to the jury and (2) ordering that Charles's possession of the children be supervised. We affirm.

## Background

Charles and Deborah Mandeville married in New Mexico in June 2000. During their marriage, the Mandevilles had five children together—three sons and two daughters. On January 7, 2014, Deborah Mandeville filed an original petition for divorce in Fort Bend County. Deborah later amended her petition to request that Charles be supervised during periods of possession of all the children and that Deborah be awarded possession at all other times.

Charles retained counsel and filed a counter-petition for divorce, including a demand for a jury trial. The counter-petition referenced a marital property agreement purportedly defining the parties' respective rights to property, both community and separate, and asked that the court divide the marital estate according to the terms of the agreement.

At the time of the divorce proceedings, Deborah and the children were living in Fort Bend County, Texas, and Charles lived and worked over one hundred miles away in Guymon, Oklahoma. By the time of the pretrial hearing, Charles no longer had counsel and instead represented himself pro se in the divorce proceedings.

### Motion in Limine

The Mandevilles each signed a "Community Property Declaration and Agreement" on June 25, 2001, roughly one year into their marriage. Deborah filed

a pretrial motion in limine including a request that Charles not mention or refer to a specific item, bank account, or retirement account as being his separate property unless and until he obtained a ruling on its admissibility outside the presence of the jury. In support, the motion referenced Charles's failure to respond to an interrogatory request seeking identification of purportedly separate property. To the extent that reference to the agreement might be used to support a claim to separate property, the motion in limine sought to require that Charles first bring the matter to the trial court's attention outside the presence of the jury. During a pretrial hearing on October 17, 2014, the trial court considered and granted Deborah's motion in limine over Charles's objections.

### *Jury Trial*

Deborah testified on both the first and second day of trial. She characterized her life and marriage with Charles as "very unstable" since the birth of their first child. The Mandevilles moved frequently, starting their marriage in New Mexico, then moving to Portland, and returning to New Mexico six days after the birth of their first child. After several work-related moves in New Mexico, the Mandevilles moved to Bloomington, Illinois. Each move was apparently driven by Charles's work preferences.

Deborah testified that, after Charles accepted a job in Oklahoma, he left their family home in Illinois, taking all of his personal possessions with him. After

3

several weeks living separately, the Mandevilles sold their Illinois home and split the proceeds. Deborah and the children then set out to move to Sugar Land, Texas.

Throughout their marriage, Deborah acted as the children's primary caregiver. In Sugar Land, Deborah continued to care for the Mandevilles' five children, while working part-time in an accounting business and substitute teaching.

Upon arriving in Sugar Land, Deborah had some difficulty enrolling the children in school as they did not yet have birth certificates or social security numbers. Deborah testified that the children had neither because Charles was against both. Though Charles never did consent, Deborah was able to get the children both birth certificates and social security numbers so that the children could be enrolled in public school and participate in extracurricular activities.

Deborah explained that all of the Mandevilles' school-aged children are doing well in school in Sugar Land. Since coming to Texas, all but the youngest have been involved in extracurricular sporting activities, including basketball, soccer, football, and swimming. The eldest also participates in a fitness and positive outlook clinic. Though the four eldest are each involved in swimming in Sugar Land, Deborah testified that Charles opposes swimming, believing pools are filthy. Deborah continued to testify that Charles generally opposes organized

activities and that he would not continue to allow the children to participate in organized sports if they primarily resided with him in Oklahoma.

Deborah further explained that their eldest son had been in counseling for the past year and a half. Deborah decided that he should begin counseling after she observed that he was having difficulty adjusting to living apart from his father. Deborah testified that, though her eldest is generally outgoing, inventive, and energetic, after spending a summer with his father in Oklahoma, he was apathetic and withdrawn, with a "pretty depressed outlook on life" upon his return to Texas. After counseling, however, he did return to being excited about school, looking forward to participating in activities, and expressing a positive outlook on the future.

Deborah testified that the other children were also negatively affected by their summer with Charles in Oklahoma. She explained that they returned from Oklahoma with a general nervousness and paranoia. By way of example, Deborah explained that the children worried that she might be killed or raped while taking the trash outside after dark. The two girls were so worried about "bad guys" that they would no longer sleep in their own room. In Deborah's opinion, "every time the kids return [from visiting their father], it's a longer period of trying to reacclimate them to just normal views on life and not being fearful." She continued, "when they go [to visit their father] . . . it's just super concentrated on

them; and . . . I'm just concerned because his paranoia is something that has a tendency to filter down."

Deborah testified that while they were cohabitating, Charles commonly expressed paranoia. For example, he expressed concerns over going to the grocery store or stopping at a gas station after dark. She continued to explain that his paranoia extended to fears of "the house being robbed, making sure the garage door was down, making sure bars were put up under the doorknobs for the front and back door before we went to bed" and concern that she would be attacked if any neighbors knew he was out of town. When the children would visit friends, Deborah testified that Charles would always have a discussion with them warning them not to be alone with someone's father. According to Deborah, such fears were a "constant discussion" in their home, notwithstanding the fact that she had never been robbed or attacked. Though Charles had expressed such fears from the beginning of their relationship, over their 14 years of marriage, the frequency increased to daily paranoid discussions. In contrast, Deborah testified that she instead preferred to talk with their children only regarding age-appropriate fears that are within the children's control and comprehension.

Deborah testified that, after discussing Charles's perception of the world in the course of counseling, the Mandevilles' marriage counselor opined that Charles

may have paranoid personality disorder. Charles refused medication, but the Mandevilles continued counseling together.

On the second day of the jury trial, Charles left the courtroom and never returned. During discussions regarding the future availability of sitting jurors and the potential of missing a single day of trial later in the week, Charles demanded a continuance, citing a need to obtain representation, and demanded a change of venue. Charles further threatened to leave the courtroom if his requests were not granted. Deborah objected to the requested continuance, noting that the parties were in the middle of a jury trial. The trial judge denied the continuance, taking care to explain to Charles that proceedings could continue to final judgment without him present should he elect to leave the courtroom. In a final comment before exiting the courtroom, Charles stated, "[p]lease record that I'm leaving under threat, duress, coercion, lack of counsel. This is absolutely not voluntary. I'm trying to save my children from sadism and evil. This is just disgusting."

After Charles left, the jury heard testimony from Jill Mandeville, Charles's paternal aunt. Jill explained that she had voluntarily flown to Texas to testify out of a concern for her nephew's stability. She was concerned about Charles's stability "[b]ecause he is so full of hatred that [she] believe[s] he's harming himself and he's doing [mental and emotional] harm to the children." Jill testified that

7

over the last couple years, her contact with Charles had been reduced to e-mail and text messages as Charles became "impossible to have conversations with."

Jill continued to testify regarding her brother, Charles's father. According to Jill, Charles's father is isolated in a trailer in New Mexico and extremely paranoid. Jill expressed concern that Charles is similar to his father, and that his behavior warrants counseling and psychological evaluation. Though Jill expects it would require a court order, she nonetheless maintained that "in terms of his interactions with the children and in life . . . [Charles] might benefit from a psychological evaluation and perhaps there might be some kind of a program that would help him to recognize the extreme negativity and paranoia that he suffers from."

Jill went on to describe Charles's parenting style as "a militaristic type of dictatorial commanding of the children . . . as opposed to a parent who . . . has a style of perhaps a nourishing relationship with the child." She explained that Charles fails to show any patience or understanding toward the children, and that "overall . . . he's generally detached, [and] not involved with them." Jill opined that Charles's visits with his children need to be supervised because Charles "can't seem to control his anger and hostility . . . [and] somebody needs to be there that can stop him from saying these things and frightening these kids."

*Final Divorce Decree*

The trial court entered a final divorce decree on November 12, 2014. Consistent with the jury verdict, the final decree ordered the parties divorced on the ground of insupportability. Deborah was appointed sole managing conservator of the children, and Charles was appointed possessory conservator. Relevant to this appeal, by a modified possession order, the trial court ordered that all periods of possession of or access to the children by Charles be supervised by the SAFE Supervised Visitation Programs of the Victim Assistance Centre, Inc., in Houston, Texas. Charles timely filed a notice of appeal on February 10, 2015.

## Motion in Limine

In his first point of error, Charles contends that the trial judge abused her discretion in granting the motion in limine, which prevented the jury from considering the Mandevilles' agreement. Deborah responds that Charles is entitled to no relief because a motion in limine is not a ruling on the evidence and Charles did not preserve error. We agree with Deborah.

### A. Applicable Law

A motion in limine operates to prevent the introduction of prejudicial questions, statements or other evidence in the presence of the jury. *In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 161 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding [mand. denied]). It is not a final evidentiary ruling, but instead

9

"merely precludes reference to the subject of the motion without first obtaining a ruling on the admissibility of those matters outside the presence of the jury." *Sims v. State*, 816 S.W.2d 502, 504 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (citing *Tempo Tamers, Inc. v. Crow-Houston Four, Ltd.*, 715 S.W.2d 658, 662 (Tex. App.—Dallas 1986, writ ref'd n.r.e.)); *see also* TEX. R. EVID. 103(d). As a result, though a ruling on a motion in limine may be erroneous, it is never reversible error in and of itself. *Id.*; *Collins v. Collins*, 904 S.W.2d 792, 799 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (en banc).

In order to complain on appeal that the trial court erroneously excluded evidence, a party must (1) attempt to introduce that evidence during the evidentiary portion of the trial, (2) if the opposing party objects, specify the purpose for which the evidence is offered and supply reasons why the evidence is admissible, (3) obtain a ruling from the trial court, and (4) if the trial court excludes the evidence, make an offer of proof. *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 629–30 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a).

**B.    Analysis**

Charles contends that, by granting the motion in limine, the trial court erroneously excluded the Mandevilles' agreement from evidence.[1] However, the

---

[1]    We recognize that Charles characterizes his complaint with respect to the

10

record does not reflect Charles offered the agreement into evidence. In fact, we have no record reflecting that Charles presented any evidence to the trial court whatsoever. In large part, this is the case because Charles left the courtroom on the second day of trial and never returned to present his case. Because the agreement was not offered into evidence, the record contains no final evidentiary ruling excluding the agreement. Accordingly, we must conclude that Charles failed to preserve error and that this complaint therefore cannot serve as a basis for reversal. *Badall v. Durgapersad*, 454 S.W.3d 626, 642 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (holding that party failed to preserve complaint that trial court erroneously excluded evidence of settlement agreement by never offering settlement agreement for admission into evidence).

In his reply brief, Charles asserts that he properly preserved error regarding the exclusion of the agreement by filing a motion for a new trial.[2] While a motion

___

motion in limine as a discovery issue. And Deborah's counsel did reference failures to respond to discovery requests in the motion in limine. However, such arguments by counsel do not transmute the trial court's ruling on the motion in limine into a discovery sanction. *See Sprague v. Sprague*, 363 S.W.3d 788, 801 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (notwithstanding favorable ruling on motion in limine, by failing to obtain pretrial ruling on discovery issue, party waived complaint regarding admissibility of evidence). More fundamentally, as will be discussed below, Charles misunderstands the basic function of a motion in limine and thereby fails to recognize that the ruling did not bar him from attempting to introduce evidence of separate property, including the agreement.

[2] Charles cites to *Boateng v. Trainblazer Health Enters., LLC*, 171 S.W.3d

for a new trial may preserve some errors, standing alone, it cannot preserve error related to the admission or exclusion of evidence. *See* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a). The fact remains that, according to the record on appeal, Charles made no attempt to actually introduce the Mandevilles' agreement into evidence. As a result, the trial court made no final evidentiary ruling regarding its admission, and any alleged error is not preserved for our review. TEX. R. APP. P. 33.1; *Badall*, 454 S.W.3d at 642; *see also Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 185 (Tex. 1978) ("Litigants who represent themselves must comply with the applicable procedural rules, or else they would be given an unfair advantage over litigants represented by counsel."); *Brown v. Tex. Emp't Comm'n*, 801 S.W.2d 5, 8 (Tex. App.—Houston [14th Dist.] 1990, writ denied) ("Pro se litigants are held to the same standards as licensed attorneys.").

481, 491 (Tex. App.—Houston [14th Dist.] 2005, pet. denied), and *Rudisell v. Paquette*, 89 S.W.3d 233, 236 (Tex. App.—Corpus Christi 2002, no pet.), to support his claim that the filing of a motion for a new trial preserved this issue for appeal. Both are inapposite. In *Boateng*, our sister court addressed the potential of preserving error through a motion for a new trial following a trial court's retroactive decision to convert a preliminary hearing into a hearing on the merits. *Boateng*, 117 S.W.3d at 491. In *Rudisell*, appellant was able to preserve error regarding imposition of sanctions for filing a groundless pleading through a motion for a new trial. *Rudisell*, 89 S.W.3d at 236. In both *Boateng* and *Rudisell*, the motion for a new trial effectively preserved errors that were not apparent to the parties until *after* the entry of judgment on the merits. Neither case lends support to the erroneous assertion that a motion for a new trial can preserve a complaint that a trial court erred in excluding evidence which was never offered and with respect to which the trial court never made a final evidentiary ruling.

## Supervised Possession

In his second point of error, Charles contends that the trial court judge abused her discretion in entering a modified possession order requiring supervision when Charles is in possession of the children, though Deborah's pleadings only requested supervised possession when Charles is in possession of *all* the children.[3]

### A.    Standard of Review

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."  TEX. FAM. CODE ANN. § 153.002 (West 2014).  It is well-settled that

---

[3]    Deborah construes Charles's second point of error to possibly argue that the trial court judge also erred in entering a modified possession order without providing reasons to support deviating from the standard possession order. To the extent that Charles had intended such an argument, we find no error.

The Texas Family Code creates a rebuttable presumption that the standard possession order (1) provides reasonable minimum possession for a parent named as a joint managing conservator and (2) is in the child's best interest. TEX. FAM. CODE ANN. § 153.252 (West 2014).  Upon receipt of a timely request, a trial court must state its specific reasons for varying from the standard possession order.  TEX. FAM. CODE ANN. § 153.258 (West 2014); *see Welsh v. Welsh*, 905 S.W.2d 615, 619–20 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (interpreting the family code to require that a trial court state reasons for deviating from a standard possession order only when timely requested to do so).  We find no such request in the record. Similarly, we find no request of the trial court to make any findings of fact. *See* TEX. R. CIV. P. 296.  As a result, we conclude that the trial court did not err by not stating grounds for deviating from the standard possession order. *Welsh*, 905 S.W.2d at 619 (in the absence of a timely request to do so, "the trial court has no obligation to state the reasons for the deviation from the standard possession order").

the trial court has broad discretion in determining the best interests of a child in family law matters. *Leithold v. Plass*, 413 S.W.2d 698 (Tex. 1967); *Messier v. Messier*, 389 S.W.3d 904, 908 (Tex. App.—Houston [14th Dist.] 2012, no pet.). This rule flows from the observation that "[t]he trial court is typically in the best position to observe the demeanor and personalities of the witnesses and to understand influences on the family dynamic that cannot be discerned by mere reference to the record." *Messier*, 389 S.W.3d at 908–09 (citing *In re N.A.S.*, 100 S.W.3d 670, 673 (Tex. App.—Dallas 2003, no pet.)).

Accordingly, we review a trial court's best-interest determination for an abuse of discretion. *Miles v. Peacock*, 229 S.W.3d 384, 391 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). A trial court abuses its discretion in this context when it acts arbitrarily, unreasonably, or without reference to any guiding rules and principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam); *McGuire v. McGuire*, 4 S.W.3d 382, 384 (Tex. App.—Houston [1st Dist.] 1999, no pet.). Under this standard, legal and factual sufficiency of the evidence are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion. *Ayala v. Ayala*, 387 S.W.3d 721, 726 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A trial court does not abuse its discretion when there is some evidence of a substantive and probative character to support its judgment. *Id.*

**B. Applicable Law**

The pleadings are relied upon to define the issues at trial. *Garvey v. Vawter*, 795 S.W.2d 741, 742 (Tex. 1990). A pleading is considered sufficient if it provides an opposing party with enough information to enable him or her to prepare a defense. *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982). Generally speaking, a judgment must be supported by the pleadings, and a party may not be granted relief in the absence of pleadings to support such relief.[4] TEX. R. CIV. P. 301; *King v. Lyons*, 457 S.W.3d 122, 126 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Absent a clear abuse of discretion, we will not unsettle a trial court's determination as to whether pleadings include sufficient allegations to give fair notice of a claim or requested relief. *Montes v. Filley*, 359 S.W.3d 260, 264 (Tex. App.—El Paso 2011, no pet.).

---

[4] Regarding the sufficiency of the pleadings, though adequate citations were not provided, we believe Charles directs our attention to *Smith v. Aramark Corp.*, Nos. 13–11–00500–CV & 13–11–00708–CV, 2013 WL 3568275 (Tex. App.—Corpus Christi July 11, 2013, no pet.) (mem. op.), and *In re Sullender*, No. 12–12–00058–CV, 2012 WL 2832542 (Tex. App.—Tyler July 11, 2012, no pet.) (mem. op.). Both are inapposite. *Aramark* concerns adequacy of an appellant's brief relative to Texas Rules of Appellate Procedure 9.4(e), 9.4(i)(3) and 38.1(k). *Aramark*, 2013 WL 3568275, at *1. *In re Sullender* concerns requirements to survive a motion to dismiss in the context of pleadings seeking court-ordered access to children by a grandparent while one fit parent is still alive and caring for the children. *In re Sullender*, 2012 WL 2832542, at *2. Neither case sheds light on the pleading requirements in the instant context.

15

## C.    Analysis

Charles contends that the trial court judge erred by ordering that his possession be supervised at all times because Deborah's pleadings (1) only sought supervised possession when Charles is "in possession of all of the children at the same time" and (2) allegedly failed to state grounds supporting supervised possession.

Myriad cases address the import of and specificity required for pleadings relative to the wide discretion afforded to trial courts in fashioning terms of custody, control, possession, and visitation that meet the best interests of children. For instance, in *MacCallum v. MacCallum*, 801 S.W.2d 579 (Tex. App.—Corpus Christi 1990, writ denied), notwithstanding the fact that the mother had not sought such relief by her pleadings, the trial court restricted the father from allowing his sons to operate farm equipment or to participate in the mixing or application of herbicides, pesticides, or other farm chemicals during periods of visitation until they were 14 years old. *MacCallum*, 801 S.W.2d at 586–87. On appeal, the court observed that "[p]leadings are of little importance in child custody cases and the trial court's efforts to exercise broad, equitable powers in determining what will be best for the future welfare of a child should be unhampered by narrow technical rulings." *Id.* at 586.

In *Peck v. Peck*, 172 S.W.3d 26 (Tex. App.—Dallas 2005, pet. denied), a father appealed an injunction included in a divorce decree that enjoined both parties from permitting a person of the opposite sex with whom they have or might have an intimate or dating relationship from spending the night when that parent had possession of the children. *Peck*, 172 S.W.3d at 32. Though the injunction was not supported by the mother's pleadings, relying on *MacCallum*, the Dallas Court of Appeals upheld the injunction, noting that "the trial court has discretion to place conditions on parents' visitation even if the pleadings do not request such conditions." *Id.* at 35.

In *O'Connor v. O'Connor*, 245 S.W.3d 511 (Tex. App.—Houston [1st Dist.] 2007, no pet.), appellant argued that the trial court erred by entering a permanent injunction barring her from any physical access to her children, which she believed was not in the children's best interest and exceeded the requested relief sought by appellee—supervised possession. *O'Connor*, 245 S.W.3d at 518. Considering evidence of appellant's unstable and uncontrolled behavior and her unwillingness to get necessary help, we found no abuse of discretion in the trial court's determination that the injunction was in the children's best interest. *Id.*

Here, Deborah's petition requested supervised possession. In Paragraph 9, Deborah requested that "Charles Mandeville should be granted supervised possession when in possession of all of the children at the same time with a

standard possession order." Thus, Deborah's pleading afforded notice to Charles that she was requesting that the trial court consider the issue of supervised possession. *See Messier*, 389 S.W.3d at 908. Because a request for supervised possession directly relates to issues of custody, control, possession, and visitation, the trial court enjoyed wide discretion in determining the best interests of the children with respect to the possibility of supervised possession. *MacCallum*, 801 S.W.2d at 587; *cf. King*, 457 S.W.3d at 124 (finding abuse of discretion in mutual injunctions restricting parents' proximity to each other's homes and places of employment because such restrictions did not directly relate to custody, control, possession, and visitation).

In exercising that broad discretion, rather than ordering supervised possession when Charles is in possession of *all* the Mandevilles' children, the trial court ordered supervised possession whenever Charles is in possession of *any* of the Mandevilles' children. Relative to existing precedents, we conclude that this modest departure was adequately supported by the pleadings. *Cf. O'Connor*, 245 S.W.3d at 518 (pleadings seeking supervised possession adequately supported entry of permanent injunction barring mother from any physical access to her children).

Because the pleadings support the judgment, requiring supervised possession as ordered would only amount to an abuse of discretion if the record lacks some

evidence supporting the trial court's determination that the best interests of the children are served by requiring supervised possession at all times. Factors to consider in determining the best interests of the children include: (1) desires of the children, (2) emotional and physical needs of the children now and in the future, (3) emotional and physical danger to the children now and in the future, (4) parental abilities of individuals involved, (5) programs available to those individuals to promote the best interests of the children, (6) plans for the children by these individuals, (7) stability of the home, (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

We conclude that the trial court heard evidence sufficient to support its determination that supervised possession would be in the best interests of the children. Deborah and Charles's aunt each testified to a need for supervised possession based on Charles's lack of experience in and aptitude for caring for the children. Both expressed concerns regarding Charles's increasingly unstable and paranoid behavior, and both observed resulting negative effects on the children's mental and emotional well-being. Deborah testified that Charles would not allow the children to participate in extracurricular and group sporting activities, which the children presently enjoy. In light of such evidence, we conclude that the trial

court reasonably exercised its discretion in determining that the best interest of the children would be served by requiring supervised possession and that the ordered relief was adequately supported by Deborah's pleadings. *In re A.D.*, -- S.W.3d --, 2014 WL 1800082, at *12–13 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (though father pled only for standard possession, record as a whole suggested that child was in danger while in mother's custody and supported order requiring mother's visitation with child be supervised).

## Conclusion

We affirm the trial court's judgment.


Rebeca Huddle
Justice

Panel consists of Justices Higley, Huddle, and Lloyd.